## Omelchenko Estate

[black redaction bars]

*Murray B. Dolfman* and *Morris Boiman*, for petitioner.

*Irwin Paul*, for respondent.

OPINION RY BRUNO, J., MAY 12, 1981:

This matter is before the court on a petition for a citation directed to Michael Pantuck and Rose Pantuck, executors of the estate of Jacob Omelchenko, deceased, to show cause why the inheritance tax in the estate has not been paid. After a timely answer was filed thereto, the matter was assigned to the instant hearing judge for disposition.

Jacob Omelchenko died on August 23, 1969, leaving a will dated April 13, 1969 by which he gave the residue of his estate to his brother, Morris Omelchenko, his nieces, Ann Cimino and Rose Pantuck, and his nephew, Steven Omelchenko.

On November 19, 1969, letters testamentary were granted by the Register of Wills of Philadelphia County to Morris Omelchenko, Michael Pantuck and Rose Pantuck.

On February 11, 1971, the Commonwealth of Pennsylvania, through its appraiser, Edward J. Connor, appraised the estate as follows:

| | |
|---|---|
| Personal property | $371,810.92 |
| Less debts & deductions | 11,046.50 |
| Net taxable estate | $360,764.42 |
| Tax rate | 15% |
| Tax due | 5,411.46 plus interest from 11/23/70. |

Neither the Commonwealth nor the estate protested or ap-

pealed the assessment and appraisement within the 60 days required by law.

Payment of the above stated tax due was made on March 23, 1971 in the sum of $5,411.66 and on July 24, 1972 in the sum of $108.23. Upon receipt of the payments the Commonwealth marked the bill "Balance due, zero."

Sometime thereafter, the Department of Revenue realized that a mathematical error had been made, in that 15% of $360,764.42 is $54,114.66 and not $5,411.46. As a consequence of that discovery, a corrected bill in the sum of $54,114.66 less credit for the tax previously paid of $5,528.35 was sent to the estate representatives. That bill was sent on December 7, 1978, almost seven years after the estate made its tax payment.

The bill remained unpaid and the Department of Revenue, on May 14, 1979 and June 27, 1979, sent certified letters demanding payment to the executors. The letters produced no payment and on December 16, 1979 the Commonwealth instituted these proceedings to compel the payment of the tax.

It is the Commonwealth's contention that an error of its appraiser cannot deprive the Commonwealth of its right to collect a tax that is found to be due. Therefore, the executors of the estate, never having been discharged or never having an account audited, are liable for the payment of the tax.

The executors contend that the Commonwealth cannot collect the tax. In support of their contention they assert two defenses, viz., estoppel and the statute of limitations. Each defense will be considered separately.

### The Doctrine of Estoppel

The executors submit that, having been informed by the Commonwealth that no further tax was due, they distributed the assets of the estate to the residuary legatees. They claim that the Commonwealth, having made the representation, caused them to rely on the representation, and, therefore, the Commonwealth is now estopped from asserting any claim for the additional tax.

In *Wilson Est.*, 7 FIDUC. REP. 79, it was held that a mathematical error made by the Commonwealth's appraiser in the computation of inheritance tax cannot deprive the Commonwealth of the right to collect the tax when the error is

discovered. Although the taxpayer in *Wilson Estate,* supra, did not raise estoppel as a defense, that hearing judge did discuss the doctrine and found it inapplicable. Of course, that part of the decision is merely dictum. However, in *Commonwealth v. Western, Maryland Railway Company,* 377 Pa. 312, wherein it was contended by the taxpayer that the Commonwealth was estopped to collect taxes on corporate loans by the failure of officials to impose and collect taxes on the bonds during a prior period, the Supreme Court said, at pages 320 and 321:

> "It is a fundamental legal principle that a State or other sovereignty cannot be estopped by any acts or conduct of its officers or agents in the performance of a governmental as distinguished from a proprietary function. No errors or misinformation of officers or agents can estop the government from collecting taxes legally due."

Accordingly, the court finds that the executors cannot raise the doctrine of estoppel to prevent the Commonwealth from collecting the tax.

### The Statute of Limitations

The executors contend that the Commonwealth, like any other creditor, is subject to the statute of limitations. Therefore, having failed to institute suit within six years, the Commonwealth cannot collect the tax.

In support of this contention, the executors present two distinct arguments. Each will be considered separately.

First, the executors submit that this action, not falling within one of the three exceptions contained in Section 5531 of the Judicial Code (42 P.S. §5531), cannot now be maintained. Section 5531 of the Judicial Code, captioned "No limitation", provides that three types of actions may be maintained at any time. Those actions are (1) suits against an attorney at law by a client to enforce an implied or resulting trust as to real estate; (2) actions by the Commonwealth against the real or personal property of persons who were public charges to recover the costs of their maintenance and support; and (3) suits by the Commonwealth against the real or personal property of persons legally liable to support persons who were public charges to recover the costs of that maintenance and support.

Since this action does not fall within one of the three types of actions specifically exempted from the running of a statute of limitations, it must be dismissed because the Commonwealth failed to institute it within six years from the time when the tax was first due. The court cannot agree.

Section 5531 is merely a reenactment of two older statutes, viz., the Act of March 27, 1865 (P.L. 56), Section 1 (12 P.S. §84) and the Act of July 15, 1935 (P.L. 997), Section 1 (62 P.S. §1576). Neither of the prior statutes changed the public policy expressed in the maxim *nullum tempus occurrit regi.* See *Frey's Est.,* 342 Pa. 351. Section 5531 is merely part of the statutory reorganization to the new Code form. It was not enacted to work any substantive change in the law.

The court finds, therefore, that Section 5531 of the Judicial Code does not prevent the Commonwealth from bringing this action.

Second, the executors contend that the Supreme Court caused the Commonwealth to become subject to the running of the statute of limitations by its decision in *Mayle v. Pennsylvania Department of Highways,* 479 Pa. 382.

In that case, Jimmy Mayle brought an action in trespass against the Department of Highways for damages incurred as a result of injuries allegedly caused by the Department's negligent maintenance of a public highway. The Department raised the defense of sovereign immunity and the lower court dismissed the complaint. The Supreme Court, after extended discussion, concluded that sovereign immunity is a common law doctrine, not a constitutional one: that it "is unfair and unsuited to the times"; and that the court has the power to abolish sovereign immunity. The court, therefore, abrogated the doctrine of sovereign immunity and reversed the lower court.

*Mayle v. Pennsylvania Department of Highways,* supra, concerned the Commonwealth's immunity from tort liability and had nothing to do with the Commonwealth's immunity from the running of the statute of limitations. However, that issue was raised in *Pennsylvania Department of Transportation v. Bethlehem Steel,* 404 A.2d 692. Unfortunately, the appeal was dismissed on other grounds per curiam.

In *PennDOT v. Bethlehem Steel,* supra, the Commonwealth Court refused to allow an amendment of an answer so as to raise the statute of limitations as a defense in light of the *Mayle* decision. The defendant was permitted to appeal so that the Supreme Court would "consider the continued validity of the rule that the statute of limitations does not run against the Commonwealth in light of *Mayle v. Pennsylvania Department of Highways* . . . :" 404 A2d at 693. The court held, however, that the Commonwealth Court, under the facts of the case, did not abuse its discretion in refusing to allow the amendment to the answer.

Justice Manderino filed a dissenting opinion castigating the majority for not addressing the important issue of the continuing validity of the rule *nullum tempus occurrit regi.* He stated, "There is arguable merit to the contention, that *Mayle,* by stripping away sovereign immunity, affected the sovereign's immunity to the running of the statute of limitations": 404 A.2d at 695. It is from this statement of Justice Manderino that the executors take their cue and raise the statute of limitations as a defense.

Admittedly, the argument of the executors has a certain seductive appeal. *Nullum tempus* is an integral aspect of sovereign immunity. Therefore, if sovereign immunity is abolished then *nullum tempus* is, of necessity, abolished. If the Commonwealth, as a defendant, can no longer use sovereign immunity as a shield then the Commonwealth, as a plaintiff, should no longer be able to use *nullum tempus* as a sword enabling it to slash through the time barriers erected around other plaintiffs.

However, the court is not convinced that *nullum tempus* is no longer a part of the jurisprudence of the Commonwealth.

While *Frey's Estate,* supra, makes the blanket statement that statutes of limitations do not run against the Commonwealth, that statement is not an accurate reflection of the law. As a general principle, the statute of limitations does not run against the Commonwealth when it acts in its governmental capacity. See, e.g., *Commonwealth v. Musser Forests, Inc.,* 394 Pa. 205. However, statutes of limitations do run against the Commonwealth when it acts in its proprietary capacity. See,

e.g., *Philadelphia v. Holmes Electric Protective Company of Philadelphia,* 355 Pa. 273. In addition, not all instrumentalities of the government can claim the benefit of *nullum tempus.* See, e.g., *Pennsylvania Turnpike Commission v. Atlantic Richfield Co.,* 31 Common. Ct. 212.

The court is not convinced that *Mayle* has, by implication, abolished these time-honored distinctions. There are no compelling reasons to extend *Mayle* to the lengths the executors desire.

*Mayle* is merely the latest in a line of cases in which the Supreme Court abolished a status-based immunity because that immunity worked a terrible injustice. As a result of that decision private citizens wronged by the tortious conduct of an agent or officer of the Commonwealth can now seek redress in the courts. See *Kenno v. Pennsylvania Department of State Police,* 481 Pa. 562; *Reinert v. Pennsylvania Department of Transportation,* 482 Pa. 612. *Mayle* was decided in favor of the private citizen so that substantial justice could be achieved.

That rationale is not present in the instant case. The executors of this estate are not private citizens being wronged by the tortious conduct of a Commonwealth officer. One need not be schooled in the complexities of quantum mechanics to realize that 15% of $360,764 is not $5,411.46. The mistake is glaring and could hardly have gone unnoticed. To extend *Mayle* and to apply that extension to this matter would work an unjustice. The court would allow the executors to avoid the payment of a tax otherwise legally due and owing. The citizens of the Commonwealth would be the wronged parties, not the executors.

There is another reason for not extending *Mayle.* Recent legislative actions clearly show that sovereign immunity continues to be a part of the public policy of the Commonwealth. The court's opinion in *Mayle* makes it abundantly clear that sovereign immunity is not mandated by the Pennsylvania constitution. Rather, it is a common law doctrine. Therefore, being created by judges, it can be destroyed by judges.

Two months after that decision, however, the General Assembly enacted, and the governor signed into law, Section 5110 of the Judicial Code (42 P.S.C.A. §5110). That section

reestablishes sovereign immunity except in eight limited instances. As the Official Source Note states, Section 5110 was enacted specifically in response to the *Mayle* decision. The note reads as follows:

> This act is intended to specifically respond to and prescribe limitations on the decision of *Mayle v. Commonwealth,* decided on July 14, 1978.

The enactment of Section 5110 clearly demonstrates that sovereign immunity has continuing validity. Sovereign immunity is the law of this Commonwealth.

This court is aware of the decision in *Pennsylvania Department of Transportation v. J. W. Bishop & Co.,* 423 A.2d 733, in which the Commonwealth Court decided that ". . . the Commonwealth is no longer exempted from compliance with statutes of limitations by the doctrine of *nullum tempus occurrit regi.*" In that case, the court granted defendant's motion for summary judgment based on the Commonwealth's failure to file suit within a six year statutory period for damage to property. The Commonwealth Court, with three judges dissenting, based its decision squarely on its reading of *Mayle.* The majority stated ". . . we perceive that the death of the kingly prerogative of the state was pronounced by the Pennsylvania Supreme Court in *Mayle v. Pennsylvania Department of Highways . . .*" The decision then stated:

> In *Mayle,* our Supreme Court discarded the judicial doctrine of sovereign immunity because it irrationally made justice depend upon the status of one party, and because, without it, the state can be expected to be more efficient. We cannot deny the relevance of these same considerations to the abolition of *nullum tempus.* 423 A.2d at 775.

Nonetheless, this court cannot regard that decision as authoritative. First, the majority misread the *Mayle* decision. They were of the opinion that sovereign immunity is a constitutional doctrine. If *Mayle* is read correctly, it becomes clear that sovereign immunity is a common law doctrine. Were it in fact a constitutional doctrine the Supreme Court could not have so easily abrogated it. Second, the case was decided two years after the enactment of Section 5110 of the Judicial Code. The majority totally ignored the legislative reestablishment of sovereign immunity as a part of the public policy of the Commonwealth.

The court finds, therefore, that the statute of limitations does not bar the Department of Revenue from bringing this action to collect the inheritance tax.

Finally, the executors contend that, having no assets remaining to pay the inheritance tax, no purpose would be served to the court ordering them to pay the tax. That argument is totally devoid of merit. Section 741 of the Inheritance and Estate Tax Act plainly imposes a personal liability on the personal representative for any distributions made to beneficiaries. That Section provides in pertinent part as follows:

> Subject to the provisions of Section 718, every personal representative, or other fiduciary . . . in possession of any property . . . the transfer of which is subject to a tax imposed by this Act shall deduct the tax from the property. Any delivery of property or instruments by such fiduciary to a transferee except in accordance with a decree of distribution of the Court shall not relieve him of personal liability for a tax imposed by this Act.

The executors have never sought to have an account of their administration audited by a court of competent jurisdiction. The distributions made by them were made at their own risk. Therefore, they are not relieved of the personal liability for the payment of the tax.

In addition, the three co-executors distributed the estate to four beneficiaries. Rose Pantuck, a co-executor, was also a distributee of 25% of the residue; Morris Omelchenko, a co-executor, received 25% of the residue; and Anna Cimino and Stephen Omelchenko, the children of Morris Omelchenko, received the remaining 50% of the estate. Therefore, the fiduciaries distributed 50% of the estate to themselves and the remaining 50% to the children of one of the fiduciaries.

Accordingly, the court enters the following

*Decree*

And Now, This 12th day of May, 1981, it is Ordered and Decreed that Michael Pantuck and Rose Pantuck, executors of the estate of Jacob Omelchenko, deceased, pay forthwith the sum of $48,586.31 plus interest from December 7, 1978 to the Commonwealth of Pennsylvania, being the sum due the Commonwealth under the Inheritance and Estate Tax Act of 1961.

Unless written objections are filed to this Decree within

fifteen (15) days from the date hereof, the Opinion and Decree shall become absolute as of course.